# In the United States Court of Federal Claims

No. 23-120C

(Filed: February 18, 2025)

|  |  |
|---|---|
| **JOHN PATRICK WHITE,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE UNITED STATES,** | ) |
| | ) |
| *Defendant.* | ) |

*Shane Hannon*, Blank Rome LLP, Washington, D.C., for Plaintiff.

*Patrick Angulo*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Deborah A. Bynum*, Assistant Director.  Of counsel was *John Corrigan*, General Litigation Division, Office of the Judge Advocate General, Department of the Navy.

## OPINION AND ORDER

***SOLOMSON*, Judge.**

      During oral argument in *Harrow v. Department of Defense*, 601 U.S. 480 (2024), Justice Gorsuch asked in wonderment — or perhaps exasperation — why the government had resisted the petitioner's case "so strongly."[1]  The petitioner in *Harrow* had a plausible argument that a filing deadline wasn't a jurisdictional bar, he had "acted as quickly . . . as he could[,] . . . and yet," Justice Gorsuch lamented, "here we are in the Supreme Court of the United States over a $3,000 claim."[2]  This Court more or less has the same question for the government here: why is the government fighting tooth-and-nail over

---

[1] https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/23-21_7m4e.pdf (https://perma.cc/VL62-Q2JL), at 17:3-13.

[2] *Id.*

approximately $7,000 where the claim is more than plausible?  Just as in *Harrow*, the government responds that it is vindicating an important jurisdictional principle.  And yet, just as in *Harrow*, despite the fact that the jurisdictional argument is not a slam dunk, the government is expending significant time and resources arguing over a relatively small sum of money.  Whether to fight a small claim is surely the Executive Branch's sole prerogative, and ordinarily this Court wouldn't begrudge the government or otherwise comment on it.  But in this case, what compounds this Court's incredulity is that the government essentially admitted its error.  For the reasons explained below, this Court remands this matter to the United States Department of the Navy to give the agency the opportunity to make things right or to provide a rational explanation for its decision not to fully remediate the agency's error.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[3]

### A.  Mr. White is Assigned to the USS *Chosin*

In December 2019, the Navy relocated the USS *Chosin*, a guided missile cruiser, from San Diego to Washington state to "conduct an extended Dry dock Selected Restricted Availability[.]"  AR 002, 070–74.  The *Chosin* was scheduled to undergo a "Modernization Period" at Vigor Shipyard in Seattle from December 2019 to June 2022.  AR 067.  But even though the ship was physically located in Seattle from day one of the modernization period, the Navy's order relocating the ship instructed that "the crew will be homeported in Everett, WA."[4]  AR 059 (explaining that the Commander of the Navy Region Northwest "possesses the infrastructure and facilities at Naval Station Everett to support this action").

---

[3] This background section constitutes the Court's findings of fact drawn from the administrative record.  Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), covering judgment on the administrative record, "is properly understood as intending to provide for an expedited trial on the record" and requires the Court to "make factual findings from the record evidence as if it were conducting a trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005).  Citations to the corrected administrative record, *see* ECF No. 11, are denoted as "AR" followed by the page number.

[4] Everett is a Seattle suburb, located approximately 25 miles north of the city.  *About Everett*, Everett Washington (last visited Feb. 6, 2025), https://www.everettwa.gov/272/About-Everett (https://perma.cc/MCD9-C6PE).

Plaintiff, John Patrick White, was a cryptologist in the United States Navy.[5]  ECF No. 30 at 2–6.  Prior to July 2021, he was stationed in Fort Meade, Maryland.  AR 077.  In June of 2021, the Navy ordered Mr. White to report to the USS *Chosin*, located in Seattle, following a brief one-month temporary assignment in Florida.  AR 091–93.

Because Mr. White was moving from Maryland to Washington state, he needed new housing.  *See* AR 096 (providing housing information).  Pursuant to 37 U.S.C. § 403, military servicemembers are either provided with housing at their duty station or receive a Basic Housing Allowance ("BAH") to subsidize housing they obtain on their own.  *See* 37 U.S.C. § 403 ("Basic allowance for housing").  That statute provides that "[t]he amount of the basic allowance for housing for a member will vary according to the pay grade in which the member is assigned . . ., the dependency status of the member, *and the geographic location of the member*."  *Id.* § 403(a) (emphasis added).

In Mr. White's case, the Navy didn't provide him with housing, so he found a place to live in Seattle, where the USS *Chosin* was located and where he would be reporting for duty.  ECF No. 44 at ¶ 28.[6]  Notwithstanding that BAH must be paid based on "the geographic location of the member" pursuant to 37 U.S.C. § 403(a), the Navy paid Mr. White the BAH rate for Everett — and not Seattle — because the USS *Chosin* was "homeported" in Everett.  *See* AR 018, 048.  Seattle is a more expensive housing market than Everett.  Seattle's BAH rate was $648 higher than Everett's in 2021, and $534 greater than Everett's in 2022.  AR 018–21.  Thus, the Navy's decision to pay Mr. White the Everett BAH rates meant he received a lower housing allowance than if he had been paid the BAH rate for Seattle — where both the USS *Chosin* was physically located and where Mr. White lived (*i.e.*, his "geographic location" in statutory terms).

On July 22, 2022 — eleven months after Mr. White transferred to the USS *Chosin* — the Navy issued a new order effectively acknowledging the agency's error regarding the ship's homeport.  AR 076.  In particular, the Navy's new homeporting order shifted the USS *Chosin*'s homeport "from Everett, WA to Seattle, WA, the actual site of the Depot Modernization[,]" and admitted that this "homeport change will *allow the crew to receive proper entitlements*."  *Id.* (emphasis added).  Starting that same month, the Navy began paying Mr. White the Seattle BAH rate.  AR 021, 047.  But the Navy did not compensate

---

[5] According to Mr. White's amended complaint, he was honorably discharged from the Navy in 2023.  ECF No. 44 at ¶ 5.  The government does not to dispute this allegation.

[6] The government does not dispute that Mr. White lived in Seattle, rather than Everett, in order to be closer to the USS *Chosin*, where he reported for duty.

Mr. White for the months he was paid the Everett BAH rate instead of the Seattle BAH rate. Mr. White contends that the Navy underpaid his BAH by using the Everett rates from August 2021 to July 22, 2022, the date the Navy issued the corrective homeporting order.

### B. Mr. White's Petition to the Board for Correction of Naval Records

On September 9, 2022, Mr. White filed a petition with the Board for Correction of Naval Records ("BCNR") for relief in the form of backpay. AR 006, 109. Mr. White argued that he "should have been receiving Seattle BAH the whole time" and requested backpay in the amount of $7,370 (apparently reflecting his calculation of the difference between the Seattle and Everett BAH rates during the relevant period). AR 006.

On February 22, 2023, the BCNR denied Mr. White's petition. AR 001–04. The BCNR referenced the Navy's July 2022 order that corrected the *Chosin*'s homeport to Seattle to "allow the crew to receive proper entitlements," but found that the Department of Defense's Financial Management Regulations ("FMR") controlling. AR 003. The BCNR explained that the FMR provides that, for servicemembers assigned to ships, BAH is calculated based on the ship's homeport, not necessarily the ship's physical location. AR 003, 045. In particular, the FMR provides that "*[o]rdinarily* a housing allowance is paid based on the Service member's [permanent duty station ("PDS")] or the home port for a Service member assigned to a ship." FMR vol. 7a, ch. 26 §§ 1.1, 10.1.2 (May 2024) (emphasis added). Thus, the BCNR concluded that "[w]hen the Navy leadership designated Everett, Washington as the CHOSIN's home port[,] that became the basis of the rate for the crew housing allowances. [Mr. White was] therefore being paid the correct BAH based on [his] ship's homeport." AR 003.

### C. Mr. White Files Suit in this Court

On January 26, 2023, Mr. White filed a *pro se* complaint against the United States, acting by and through the Department of the Navy. ECF No. 1. The parties filed cross motions for judgment on the administrative record ("MJARs") and supplemental briefs. *See* ECF Nos. 20, 23, 26, 30, 31. On April 18, 2024, this Court stayed the case and referred Mr. White for pro bono representation. ECF No. 36. Two months later, Mr. White obtained legal counsel to represent him in this matter, and, on July 26, 2024, he filed an amended complaint. ECF No. 44. In his amended complaint, Mr. White claimed that he is entitled to BAH back pay in the amount of $6,955.47, pursuant to the Tucker Act, 28 U.S.C. § 1491(a), and 37 U.S.C. § 403. *Id.* at 10–12.

Following the filing of his amended complaint, Mr. White filed a new MJAR, ECF No. 45 (Pl. MJAR), and the United States responded in opposition with its own combined cross-MJAR and motion to dismiss for lack of jurisdiction pursuant to RCFC 12(b)(1). ECF No. 46 (Def. MJAR).  Mr. White filed his reply and response brief.  ECF No. 47 (Pl. Resp.)  And the government filed a timely reply brief.  ECF No. 50 (Def. Rep.).

## II. JURISDICTION

### A. The Tucker Act Provides this Court with Jurisdiction for Money-Mandating Military Pay Claims

"The Tucker Act grants jurisdiction to the [United States Court of Federal Claims] over certain actions for monetary relief against the United States."  *Mote v. United States*, 110 F.4th 1345, 1352 (Fed. Cir. 2024) (citing 28 U.S.C. § 1491).  In particular, the Tucker Act provides that this Court:

> shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).  But the "Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages."  *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part) (first citing *United States v. Mitchell*, 463 U.S. 206, 216 (1983), and then *United States v. Testan*, 424 U.S. 392, 398 (1976)).  In the parlance of Tucker Act cases, that source must be "money-mandating."  *Id.; see also Boeing Co. v. United States*, 119 F.4th 17, 21 (Fed. Cir. 2024) ("Pursuant to § 1491(a)(1) of the Tucker Act, the Court of Federal Claims also has jurisdiction to entertain monetary claims against the United States based on contracts with the United States, the Constitution, or other money mandating statutes or regulation. 28 U.S.C. § 1491(a)(1).").

In evaluating whether a plaintiff has stated a money-mandating claim within this Court's Tucker Act jurisdiction, our appellate court — the United States Court of Appeals for the Federal Circuit — has instructed us to proceed as follows:

> When a complaint is filed alleging a Tucker Act claim based on a Constitutional provision, statute, or regulation, *see* 28 U.S.C. § 1491(a)(1), the trial court at the outset shall determine, either in response to a motion by the Government or *sua sponte* (the court is always responsible for its own jurisdiction), whether the Constitutional provision, statute, or regulation is one that is money-mandating.

> If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare that it has jurisdiction over the cause, and shall then proceed with the case in the normal course. For purposes of the case before the trial court, the determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action.

*Fisher*, 402 F.3d at 1173.

A statute or regulation is money-mandating where it "can fairly be interpreted as mandating compensation by the Federal Government . . . ." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (quoting *Mitchell*, 463 U.S. at 217). For jurisdictional purposes, it is sufficient "that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages." *Id.* at 473. In addition, the statute and regulations must be money-mandating as to the class of which plaintiff claims to be a member. *Casa de Cambio Comdiv S.A. de C.V. v. United States*, 291 F.3d 1356, 1361 (Fed. Cir. 2002) (holding that, even if "[the regulations] were money-mandating as to [third party]," they "are not money-mandating as to [plaintiff] since there is no indication that they were designed to convey rights to [members of plaintiff's class]").

B.  Mr. White's Claim for BAH Pay is a Proper Money-Mandating Claim

Although the government initially suggested in its motion to dismiss that 37 U.S.C. § 403(a) is not money-mandating, *see* Def. MJAR at 13 n.5, the government during oral argument conceded that § 403(a) *is* money-mandating, Tr. 5:4 – 6:5, and thus this Court generally has jurisdiction to decide Mr. White's claim for additional basic BAH pay pursuant to the Tucker Act, 28 U.S.C. § 1491(a).  *See Keltner v. United States*, 165 Fed. Cl. 484, 500 (2023) ("Military pay cases . . . involve money-mandating claims . . . .").

Nevertheless, this Court has a duty to confirm its own jurisdiction and finds that 37 U.S.C. § 403(a) is, indeed, money-mandating.  That statute provides as follows:

> (a) General Entitlement.—
>
> (1) Except as otherwise provided by law, a member of a uniformed service who is entitled to basic pay is **entitled** to a basic allowance for housing at the monthly rates prescribed under this section or another provision of law with regard to the applicable component of the basic allowance for housing. The amount of the basic allowance for housing for a member will vary according to the pay grade in which the member is assigned or distributed for basic pay purposes, the dependency status of the member, and the geographic location of the member.  The basic allowance for housing may be paid in advance.

37 U.S.C. § 403(a)(1) (emphasis added).  Given the statute's reference to pay and entitlement, it would be difficult to conceive of a statutory provision that is more obviously money-mandating than this one.  *See Wolfing v. United States*, 144 Fed. Cl. 516, 521 (2019) ("This claim for housing allowances — a claim for money that is mandated by statute — is a quintessential Tucker Act claim[.]").[7]

---

[7] Although the government in its motion to dismiss cited *Graves v. United States*, 230 F.3d 1378, 2000 WL 27903, at *2 (Fed. Cir. Jan. 11, 2000) (unpublished), that case addressed a claim for a "variable housing allowance" pursuant to 37 U.S.C. § 403a, and not a claim pursuant to § 403(a), a different statutory provision.  The reference in *Graves* to 37 U.S.C. 403(a) appears to be a typographical error, as the government acknowledged during oral argument.  Tr. 4:23 – 5:7; *see also Deggins v. United States*, 178 F.3d 1308, 1998 WL 804563, at *3 (Fed. Cir. Nov. 18, 1998) (unpublished) (comparing "sections 403 and 403a of Title 37," explaining that "[t]he two sections

But this Court's conclusion that 37 U.S.C. § 403(a)(1) is money-mandating does not end the Court's jurisdictional inquiry because the government further argues that 37 U.S.C. § 403(k)(2) precludes this Court (or any court) from exercising jurisdiction over Mr. White's claim.  Def. MJAR at 9–16.

### C. The Government's RCFC 12(b)(1) Motion is a Facial Attack on This Court's Jurisdiction

A plaintiff "bears the burden of establishing the court's jurisdiction over its claims by a preponderance of the evidence."  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  To determine whether jurisdiction is proper, this Court generally "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Id.*

The Federal Circuit has summarized the required RCFC 12(b)(1) analysis as follows:

> Where a RCFC 12(b)(1) motion "challenges the truth of jurisdictional facts alleged in the complaint, 'the court accepts as true all uncontroverted factual allegations in the complaint, and construes them in the light most favorable to the plaintiff.'"  Where a RCFC 12(b)(1) motion "simply challenges the court's subject matter jurisdiction based on the sufficiency of the pleading's allegations — that is, the movant presents a 'facial' attack on the pleading — then those allegations are taken as true and construed in a light most favorable to the complainant."  To the extent our analysis does not rely on any controverted facts, this distinction is immaterial.

---

govern different allowances for military personnel").  In *Deggins*, the Federal Circuit noted that "Section 403 states that the service member is 'entitled' to a basic allowance for quarters, while section 403a(a)(2) [only] states that a service member 'may be paid a variable housing allowance[.]'"  *Id.*  ("The two very different formulations support the inference that Section 403a(a)(2) is not a money-mandating provision, but authorizes payments to be made in the discretion of the service Secretary.").

*Chemehuevi Indian Tribe v. United States*, 104 F.4th 1314, 1320–21 (Fed. Cir. 2024) (first quoting *Creative Mgmt. Servs., LLC v. United States*, 989 F.3d 955, 961 n.4 (Fed Cir. 2021); and then *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993)).

In this case, the government's RCFC 12(b)(1) motion does not challenge any jurisdictional facts.[8]  Instead, the government's RCFC 12(b)(1) motion presents a facial attack on jurisdiction pursuant to 37 U.S.C. § 403(k)(2), an argument to which this Court turns next.

### D. The BAH Statute Does Not Divest this Court of Jurisdiction to Decide Mr. White's Money-Mandating Pay Claim

Section 403(k)(2) of Title 37 provides:

> The Secretary concerned may make such determinations as may be necessary to administer this section, including determinations of dependency and relationship.  When warranted by the circumstances, the Secretary concerned may reconsider and change or modify any such determination.  The authority of the Secretary concerned under this subsection may be delegated.  Any ***determination*** made ***under this section*** with regard to a member of the uniformed services is final ***and is not subject to review by any accounting officer of the United States or a court, unless there is fraud or gross negligence***.

37 U.S.C. § 403(k)(2) (emphasis added).  According to the government, Mr. White, at a minimum, had to — but did not — allege facts in his complaint to establish "fraud or gross negligence" sufficient to vest this Court with jurisdiction to decide his claim.  *See* Def. MJAR at 11–12.  The government asserts that Mr. White's allegations, instead, "present[] a garden-variety military pay claim alleging arbitrary and capricious agency action unsupported by substantial evidence, and contrary to law."  *Id.* at 12.  The government further argues that 37 U.S.C. § 403(k)(2) precludes such a "garden-variety military pay claim."  *Id.* at 10.

---

[8] Accordingly, this Court presumes the facts contained in Mr. White's amended complaint are true for the purposes of resolving the government's motion to dismiss.

The Court rejects the government's argument for three reasons.

*First*, the sorts of "determinations" where the statute makes judicial review unavailable are plainly those made "under this section."  37 U.S.C. § 403(k)(2).  In that regard, here is a non-exhaustive sampling of determinations "under this section" that the statute commits to the discretion of the Secretary (emphases added):

- "The Secretary of Defense ***shall determine*** the costs of adequate housing in a military housing area in the United States for all members of the uniformed services entitled to a basic allowance for housing in that area."  37 U.S.C. § 403(b)(2).

- "The monthly amount of the basic allowance for housing for an area of the United States for a member of a uniformed service shall be the amount equal to the difference between--**(i)** the amount of the monthly cost of adequate housing in that area, ***as determined by the Secretary*** of Defense, for members of the uniformed services serving in the same pay grade and with the same dependency status as the member; and **(ii)** the amount equal to a specified percentage (determined under subparagraph (B)) of the national average monthly cost of adequate housing in the United States, ***as determined by the Secretary***, for members of the uniformed services serving in the same pay grade and with the same dependency status as the member."  *Id.* § 403(b)(3)(A).

- "The Secretary of Defense shall base the amount of the increase to be made in the rates of basic allowance for housing for an area on a ***determination by the Secretary*** of the amount by which the costs of adequate housing for civilians have increased in the area by reason of the disaster[.]"  *Id.* § 403(b)(7)(B).

- "The Secretary of Defense may prescribe a temporary adjustment in the current rates of basic allowance for housing for a military housing area or a portion thereof (in this paragraph, "BAH rates") ***if the Secretary determines*** that the actual costs of adequate housing for civilians in that military housing area or portion thereof differs from the current BAH rates by more than 20 percent."  *Id.* § 403(b)(8)(A).

- "If the member's assignment to duty in that area, or the circumstances of that assignment, require the member's dependents to reside in a different area, ***as determined by the Secretary*** concerned, the amount of the basic allowance for

housing for the member shall be based on the area in which the dependents reside or the member's last duty station, ***whichever the Secretary concerned determines*** to be most equitable." *Id.* § 403(d)(3)(A).

- "If the member is reassigned for a permanent change of station or permanent change of assignment from a duty station in the United States to another duty station in the United States for a period of not more than one year for the purpose of participating in professional military education or training classes, the amount of the basic allowance for housing for the member may be based on whichever of the following areas ***the Secretary concerned determines*** will provide the more equitable basis for the allowance . . . ." *Id.* § 403(d)(3)(C).

- "In the case of a member without dependents who is assigned to a unit that undergoes a change of home port or a change of permanent duty station, ***if the Secretary concerned determines*** that it would be inequitable to base the member's entitlement to, and amount of, a basic allowance for housing on the new home port or permanent duty station, the Secretary concerned may--**(i)** waive the requirement to base the member's entitlement to, and amount of, a basic allowance for housing on the new home port or permanent duty station member; and **(ii)** treat that member for the purposes of this section as if the unit to which the member is assigned did not undergo such a change." *Id.* § 403(p)(2)(A).

But while the statute provides the Secretary of Defense with authority to make a variety of determinations such as those catalogued *supra*, the "geographic location of the member," 37 U.S.C. § 403(a)(1), isn't one of them. The "geographic location of the member" is *not* committed to the unreviewable determination of the Secretary (or his or her delegee) any more than if the agency had decided not to pay a servicemember because it wrongfully determined a servicemember to be a civilian. The government's interpretation of the jurisdiction-stripping provision would improperly read "under this section" out of the statute. *See Wolfe v. McDonough*, 28 F.4th 1348, 1354–55 (Fed. Cir. 2022) ("[A] 'statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" (quoting *Hibbs v. Winn*, 544 U.S. 88, 101 (2004)).

*Second*, even assuming for the sake of argument that "the geographic location of the member" is subject to the Secretary of Defense's discretionary determination, the Secretary in this case apparently has reconsidered, changed, or modified his previous

determination, as explained *infra*.  37 U.S.C. § 403(k)(2) (providing that "the Secretary concerned may reconsider and change or modify any such determination").  In other words, Mr. White's claim in this case does not require this Court to review the Secretary's initial homeporting determination *per se*.  Rather, this Court must decide only whether Mr. White is now entitled to the relief he seeks given that the Navy corrected its homeporting decision to allow USS *Chosin* crewmembers to receive "proper entitlements."

*Third*, the government at oral argument simply could not explain to the Court what sort of allegations of government wrongdoing (or inaction) — or by whom — might constitute the type of "fraud or gross negligence" that would provide a court with jurisdiction (even assuming the government's reading of the statute is otherwise correct). *See, e.g.*, Tr. 26:18 – 27:7 (government counsel admitting that "[f]raud is not something I had thought about").  The concept of negligence necessarily implies a standard-of-care requirement.  *See, e.g.*, *Miller v. David Grace, Inc.*, 212 P.3d 1223, 1227 (Okla. 2009) ("The cornerstone of a negligence action is the existence of a duty."); *Rash v. Boston Scientific Corp.*, 2020 WL 8455124, at *2 (W.D. Mo. Nov. 12, 2020) ("A negligence claim requires a plaintiff to prove 'the defendant owed a duty of care to the plaintiff,' the defendant's breach, and proximate cause between the breach and the harm alleged." (quoting *Wieland v. Owner-Operator Servs., Inc.*, 540 S.W.3d 845, 848 (Mo. 2018))).  But what duty of care, according to the government, does the Secretary of Defense owe servicemembers for the purpose of assessing "gross negligence" under § 403(k)(2)?  From where would the Court derive that putative duty?  The Court is loathe to adopt the government's view where the government cannot answer these basic questions or explain the precise parameters of the putative jurisdictional bar at issue.

The "fraud" exception is even more difficult to understand and apply.  An allegation of fraud (for jurisdictional purposes) would necessitate a plaintiff's alleging facts to establish some sort of wrongful government misrepresentation, and reliance by the plaintiff.  *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 188 (2022) ("Fraud typically requires '[a] knowing misrepresentation . . . of a material fact.'" (emphasis omitted) (quoting *Black's Law Dictionary* 802 (11th ed. 2019)).  But how could the government's misrepresentation to a servicemember ever cause the government to erroneously pay the servicemember?  The bottom line is that the government offers no sensible, workable approach to the concepts of either "fraud or gross negligence" in the context of the facts of this case.  37 U.S.C. § 403(k)(2).

This Court can sidestep those significant analytical problems here, however, because the government's alleged failure to comply with a money-mandating statute constitutes gross negligence.[9]  As the United States Court of Appeals for the Fifth Circuit has noted, "[t]he Government has a special duty to follow the law."  *United States v. Holley*, 23 F.3d 902, 911 (5th Cir. 1994).  Borrowing from the tort context, courts have held that a violation of the law can itself constitute negligence.  Then-Judge Cardozo famously wrote, "to omit, willfully or heedlessly, the safeguards prescribed by law for the benefit of another that he may be preserved in life or limb, is to fall short of the standard of diligence to which those who live in organized society are under a duty to conform." *Martin v. Herzog*, 126 N.E. 814, 815 (Ct. App. N.Y. 1920); *see also Jordan v. Tucker, Albin and Assocs., Inc.*, 2017 WL 2223918, at *12 (E.D.N.Y. May 19, 2017) ("[T]he violation of a statute may establish that the defendant owed a duty of care to the plaintiff and breached that duty[.]").  Indeed, "violations of state regulations constitute evidence of negligence" and that such violations may "reasonably support finding an indifference . . . rising to gross negligence[.]"  *Hopkins v. Booth*, 2017 WL 5574027, at *7 (W.D.N.Y. Nov. 20, 2017).  Of course, this is not to suggest that this Court possesses jurisdiction to decide a claim against the government for negligence *per se* (or for gross negligence); that would be a tort and thus outside of our jurisdiction.  28 U.S.C. § 1491(a).  Rather, this Court merely observes the well-established principle that alleged violations of plain statutory language may be sufficient to constitute gross negligence.  At least for jurisdictional purposes, at any rate, this Court finds Mr. White's allegations and claim sufficient for this Court to proceed to the merits.

Accordingly, even pursuant to the government's interpretation of 37 U.S.C. § 402(k)(2), Mr. White's allegation that the Navy failed to pay him properly pursuant to the plain language of the governing statute is sufficient to vest this Court with jurisdiction.  To be clear, Mr. White does not merely contend that some discretionary agency determination — committed to the Secretary's discretion — is arbitrary and capricious.  Rather, he claims that the Navy owes him BAH pursuant to the plain language of the governing statute.  Or, put differently, if Mr. White is correct, the government's failure to pay him the sum he is owed violates the applicable statute.  That is sufficient to constitute gross negligence.  In sum, this Court agrees with then-Judge Coster Williams's decision in *Wolfing* that where the government erroneously pays a servicemember in violation of statutory requirements, that constitutes "a gross failure to

---

[9] The Court again notes that for the purposes of resolving the government's motion to dismiss, we presume all of the facts in Mr. White's complaint are true.

follow a statutory mandate to pay reservists housing allowances to which they are entitled." *Wolfing*, 144 Fed. Cl. at 521.

This Court's approach to the putative jurisdictional bar makes sense in light of long-accepted canons of construction. As our appellate court has explained:

> There is a "strong presumption" favoring judicial review of agency actions. *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)). This rebuttable presumption is overcome if the "statute's language or structure demonstrates that Congress wanted an agency to police its own conduct." *Id*. The party seeking to rebut the presumption . . . "bears a 'heavy burden' of showing that the statute's 'language or structure' forecloses judicial review." *Salinas v. U.S. R.R. Ret. Bd.*, 592 U.S. 188, 197 (2021) (quoting *Mach Mining*, 575 U.S. at 486).

*Beaudette v. McDonough*, 93 F.4th 1361, 1366 (Fed. Cir. 2024) (cleaned up). The government has not met that heavy burden here.

It is one thing for this Court to believe that Congress made unreviewable highly discretionary determinations that, in turn, are based on several factual considerations — *e.g.*, the "costs of adequate housing in a military housing area," 37 U.S.C. § 403(b)(2), "the national average monthly cost of an adequate housing in the United States," *id.* § 403(b)(3)(a)(ii), or similar assessments that Congress expressly assigned to the Secretary's discretion "under this section," *id.* § 403(k)(2). In contrast, this Court cannot conclude, absent crystal-clear statutory text, that Congress intended to completely deprive servicemembers of a money-mandating cause of action. This Court's rejection of the government's broad jurisdictional argument is further supported by the United States Supreme Court's acknowledgement that "[w]e have long applied 'the canon that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor.'" *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 441 (2011) (quoting *King v. St. Vincent's Hospital*, 502 U.S. 215, 220–221, n.9 (1991)).

Other case law is not inconsistent with this Court's reading of 37 U.S.C. § 403(k)(2). The government relies on *Wheeler v. United States*, but that case dealt with a different statute that provided that "[a] determination of dependency by an administering Secretary under this chapter is conclusive" and "may not be reviewed in any court . . .

unless there has been fraud or gross negligence."  11 F.3d 156, 158–59 (Fed. Cir. 1993) (quoting 10 U.S.C. § 1084).  There, the Federal Circuit agreed with the trial court that "[t]he Secretary's determination of who is covered by an employer-sponsored health plan *is part of the Secretary's determination of dependency*."  *Id.* at 159 (emphasis added) (quoting *Wheeler v. United States*, 27 Fed. Cl. 756, 758 (1993)).  Although the Federal Circuit refused to interpret the judicial review exemption in 10 U.S.C. § 1084 as distinguishing "between factual questions, such as the finding of dependency and legal questions, such as the interpretation of a statutory term," the "unambiguous language of section 1084 provides that the determination of dependency status . . . be withdrawn from judicial scrutiny[.]" *Wheeler*, 11 F.3d at 159.  In other words, the plaintiff in *Wheeler* sought judicial review of the very decision — "dependency" — that the statute precludes courts from reviewing.

In stark contrast, here, 37 U.S.C. § 403 does ***not*** provide that "a determination of the geographic location of the member by the Secretary under this chapter is conclusive." And while that statute *does* provide that "***[a]ny*** determination made ***under this section*** with regard to a member of the uniformed services is final and is not subject to review by . . . a court," *id.* § 403(k)(2) (emphasis added), there is no indication that the "geographic location of the member," *id.* § 403(a), is committed to the sole discretion of the Secretary "***under*** this section," *id.* § 403(k)(2) (emphasis added).  To be clear, according to the government's interpretation, the Navy could order a servicemember to permanent duty in Pearl Harbor, but list his or her assignment as Gulfport, Mississippi, for "administrative purposes."  The Navy could then just decline to pay the (obviously) higher BAH in Hawaii, despite the statutory language requiring otherwise, and the servicemember would lack any judicial recourse to enforce what is otherwise a money-mandating statute.[10]  As discussed *supra*, this Court will not presume such a result in the absence of clear language.

Finally, we note that the Federal Circuit has affirmed at least one decision of this Court that implicitly reached the same interpretation as the undersigned here.  In *Sharpe*

---

[10] The government admitted as much during oral argument when presented with that hypothetical:

> [W]hen a servicemember joins the military, they do give up a certain level of autonomy.  One of those is . . . what their BAH pay is. . . .  [I]f it was Hawaii versus the Mississippi Delta, the [BCNR] might say, you know, this is really inequitable. . . .  But the determination of the Secretary of the Navy [is] not a . . . reviewable decision."

Tr. 40:15 – 41:20.

*v. United States*, 134 Fed. Cl. 805 (2017), then-Judge Wheeler concluded that 37 U.S.C. § 403 was one of several "separate money-mandating sources" of law "which govern the portions of [the plaintiff's] pay that are currently in dispute." *Sharpe*, 134 Fed. Cl. at 813. He further held that "this Court has jurisdiction pursuant to the Tucker Act to review the Navy's decision regarding the proper calculation of Mr. Sharpe's back pay," including BAH. *Id.* at 813, 817–18. Judge Wheeler ultimately rejected Mr. Sharpe's BAH claim *on the merits*, concluding that the Navy properly paid him the Norfolk BAH rate instead of the San Diego BAH rate Mr. Sharpe had claimed. *Id.* at 818. Thus, the geographic location of the servicemember was squarely at issue in that case. On appeal, the Federal Circuit affirmed Judge Wheeler's decision on the merits. *Sharpe v. United States*, 935 F.3d at 1352 (Fed. Cir. 2019). But neither Judge Wheeler nor the Federal Circuit even hinted at a jurisdictional hurdle based on 37 U.S.C. § 403(k)(2). This Court will not impose one here. *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991) (noting "our well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action"); *Acceptance Ins. Cos. Inc. v. United States,* 503 F.3d 1328, 1336 (Fed. Cir. 2007) ("[W]ithdrawal of Tucker Act jurisdiction by implication is disfavored.").

## III.    STANDARD OF REVIEW

Ordinarily, Tucker Act claims — whether of the contract, money-mandating, or illegal exaction varieties — proceed before this Court "on a *de novo* basis." *L & D Servs., Inc. v. United States*, 34 Fed. Cl. 673, 678 n.6 (1996). That is, the Court does not defer to an agency's fact finding or conclusions, but instead receives new evidence, makes its own factual findings, and reaches an independent determination regarding whether a plaintiff has substantiated its claim by a preponderance of the evidence. *See, e.g.*, *Ampersand Chowchilla Biomass, LLC v. United States*, 150 Fed. Cl. 620, 642 (2020) ("The Court reviews claims for tax refunds and [money-mandating statutory] claims . . . on a *de novo* basis."), *aff'd*, 26 F.4th 1306 (Fed. Cir. 2022); *Cherokee Gen. Corp. v. United States*, 150 Fed. Cl. 270, 283 (2020) ("Even where a contracting officer's legal opinion is fully explained (unlike here), it is not binding on the government in judicial proceedings (which are de novo) and it cannot override the language of the contract itself." (citing *Wilner v. United States*, 24 F.3d 1397, 1401–02 (Fed. Cir. 1994))); *Cencast Servs., L.P. v. United States*, 94 Fed. Cl. 425, 453 (2010) ("In general, a tax refund suit is a *de novo* proceeding and any subsidiary factual findings of the IRS are given no weight by the court."), *aff'd*, 729 F.3d 1352 (Fed. Cir. 2013); *Cnty. of Suffolk v. United States*, 19 Cl. Ct. 295, 299 (1990) ("The Claims Court typically considers allegations that a party did not fulfill its obligations under a contract on a *de novo* basis."); *Woog v. United States*, 48 Ct. Cl. 80, 94 (1913) ("The court is of opinion that

the statute under which we are taking jurisdiction requires us to make an independent investigation and to afford relief irrespective of the findings of any board.").[11]

Where Congress wants this Court to apply a more deferential standard of review, Congress has provided such instruction. The most common example is, of course, the Administrative Procedure Act's standard of review, which Congress expressly applied to actions in this Court challenging government procurement decisions pursuant to 28 U.S.C. § 1491(b). *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").[12]

Military pay cases, as noted above, involve money-mandating claims, *see* Section II, *supra*.[13] In such cases, Congress has neither required this Court to apply the APA's standard of review by express reference to that statute, nor otherwise directly imposed the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" formulation. *See* 5 U.S.C. § 706(2)(A). Nevertheless, "[a]s Mr. Justice Holmes commented . . . [,] 'a page of history is worth [a] volume of logic.'" *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 675–76, (1970) (quoting *New York Trust Co. v. Eisner*, 256

---

[11] *But see Fla. Home Med. Supply, Inc. v. United States*, 131 Fed. Cl. 170, 177–78 (2017) (contrasting a breach of contract case — where "[t]he evidence that plaintiffs may offer is governed by the relevant rules of this court, and is not limited to the information previously provided to [the agency]" — and "[t]he court's review of an agency decision," which "is limited to an administrative record and is conducted under a deferential 'arbitrary, capricious, contrary to law, or unsupported by substantial evidence' standard" (citations omitted)).

[12] Congress has imposed the arbitrary and capricious standard in other instances as well. *See, e.g.*, 50 U.S.C. § 4215(h)(1) ("A claimant may seek judicial review of a denial of compensation under this section solely in the United States Court of Federal Claims, which shall review the denial upon the administrative record and shall hold unlawful and set aside the denial if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); 42 U.S.C. § 300aa-12(e)(2) (providing that "the United States Court of Federal Claims shall have jurisdiction to undertake a review of the record of [vaccine injury] proceedings and may thereafter . . . set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

[13] *Friedman v. United States*, 158 F. Supp. 364, 376 (Ct. Cl. 1958) ("[T]he sort of 'review' contemplated in an action to recover lost pay in the Court of Claims is an original suit for a money judgment and not a review looking to the alteration or correction of an official military record or to the compelling of official action by an officer of an executive department. And such 'reviews' by this court to determine whether or not pay has illegally been withheld from a member or former member of the military services, have long been sanctioned by this court and the Supreme Court." (citing cases)).

U.S. 345, 349 (1921)).  And the history and binding precedent — for better or worse — makes quite clear that our Court as well as our predecessor and appellate tribunals have consistently applied the arbitrary and capricious standard of review since at least 1954. *Gordon v. United States*, 121 F. Supp. 625, 629 (Ct. Cl. 1954) ("By this application plaintiff invoked the jurisdiction of the Army Board on Correction of Military Records and was bound by the terms thereof unless the resulting action of the board was arbitrary or capricious, etc., or was in violation of some other substantive right."); *see Brown v. United States*, 396 F.2d 989, 991 (Ct. Cl. 1968) ("Since Congress has vested the Service Secretaries (acting on the recommendation of the various physical disability and correction boards) with such discretion in determining eligibility for disability-retired pay, we have always adhered to that scope of review." (footnotes omitted)).[14]

The Supreme Court also has long endorsed this deferential standard of review, although it has never concluded that the APA literally applies to these cases.  *See Chappell v. Wallace*, 462 U.S. 296, 303 (1983) (first citing *Grieg v. United States*, 640 F.2d 1261 (Ct. Cl. 1981); and then *Sanders v. United States*, 594 F.2d 804 (Ct. Cl. 1979), and explaining that correction board "decisions are subject to judicial review and can be set aside if they are arbitrary, capricious or not based on substantial evidence").[15]  Indeed, Supreme Court precedent supporting the application of the arbitrary and capricious standard of review to military pay cases apparently predates the APA.  *See Wales v. United States*, 130 F. Supp. 900, 904 (Ct. Cl. 1955) (holding that arbitrary and capricious standard of review applies to BCMR findings and that "the doors of this court are always open to grant relief to a party aggrieved by the action of an executive or administrative officer which is arbitrary or capricious" because "[t]he Supreme Court has long recognized the right of the court to review such action" (internal citations omitted) (citing *Dismuke v. United States*, 297 U.S. 167, 171–72 (1936))).

---

[14] This is true even where "resort to a correction board is not mandatory."  *Lewis v. United States*, 458 F.3d 1372, 1376 (Fed. Cir. 2006) (citing *Martinez v. United States*, 333 F.3d 1295, 1305 (Fed. Cir. 2003), and explaining that "where, as here, a service member has elected to pursue relief before a corrections board, we have reviewed the board's decision to determine whether it is arbitrary, capricious, unsupported by substantial evidence, or contrary to law" (other citations omitted)).

[15] *See also Clinton v. Goldsmith*, 526 U.S. 529, 539 (1999) ("A servicemember claiming something other than monetary relief may challenge a BCMR's decision . . . as final agency action under the [APA] . . . in the district courts" or "[i]n the instances in which a claim for monetary relief may be framed, a servicemember may enter the Court of Federal Claims with a challenge . . . under the Tucker Act, 28 U.S.C. § 1491" (citations omitted)).

Perhaps because the APA does not actually apply by its terms to Tucker Act monetary claims, *see* 28 U.S.C. § 1491(a),[16] binding authority from the Court of Claims "permitted the taking of *de novo* evidence by the [trial court]" in military pay cases. *Beckham v. United States*, 375 F.2d 782, 785 (Ct. Cl. 1967);[17] *see Brown*, 396 F.2d at 991–92 ("We have also, since we first began dealing with disability retirement two decades ago, regularly considered evidence over and above that presented before the administrative boards if a party wishes to offer it. . . . This coupling of the substantial-evidence standard with the acceptance of new evidence has not . . . encroached on the administrative process.").

Notwithstanding that *Beckham* and *Brown* are consistent with the money-mandating nature of military pay claims — and even though Congress never applied the APA to military pay claims in Tucker Act cases — the Federal Circuit, in a split panel decision in *Walls v. United States*, 582 F.3d 1358 (Fed. Cir. 2009), concluded that "it has become well established that judicial review of decisions of military correction boards *is conducted under the APA*." 582 F.3d at 1367 (emphasis added and footnote omitted); *see also Pearl v. United States*, 111 Fed. Cl. 301, 303 n.1 (2013) (noting that "[a]lthough the APA [is] explicitly cited only in the portion of the Tucker Act pursuant to which this court exercises jurisdiction in bid protests, *see* 28 U.S.C. § 1491(b)(4), 'it has become well established that judicial review of decisions of military corrections boards is conducted under the APA' standard of review" (quoting *Walls*, 582 F.3d at 1367)).[18] The Federal

---

[16] *See Bowen v. Massachusetts*, 487 U.S. 879 (1988); *District of Columbia v. United States*, 67 Fed. Cl. 292, 305 (2005) (contrasting "two waivers of sovereign immunity" — "[t]he first is found in the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), the foundation of this court's jurisdiction, and the second is found in the [APA], 5 U.S.C. §§ 701–706 (2000), which gives United States district courts jurisdiction over certain claims 'seeking relief other than money damages' against the United States, *id.* § 702" (footnote omitted)).

[17] *See Beckham*, 375 F.2d at 785 ("In determining the arbitrariness, capriciousness, or insubstantiality of an administrative decision, it is not necessary that the review always be restricted to the record before the administrative body. . . . This has not prevented the court from applying its substantial evidence test to the findings of the Board. All that this procedure has done is to expand our substantiality test. We do not ask if the Board decision is supported by substantial evidence upon an inspection of the record, but instead, we ask if the decision meets the test when compared with all available evidence — that is both the record and the de novo evidence.").

[18] Judge Newman dissented at length in *Walls*. *See Walls*, 582 F.3d at 1369–81 (Newman, J., dissenting) ("The *Brown* ruling continues to be the law of this circuit." (footnote omitted) (citing *Bray v. United States*, 515 F.2d 1383 (Ct. Cl. 1975), amongst other cases)). Judge Newman maintained that "[n]o authority disturbs the long-standing rulings that because of the nature of

Circuit thus applied APA cases and procurement protest decisions to find that our review of military pay claims "is generally limited to the administrative record." *Id.* at 1367–68 (discussing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–744 (1985), *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009), and *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001)).[19] Judge Wolski's summary of the standard of review, however, is more accurate: "[t]he Court reviews the decision of a Secretary acting through a Correction Board according to a standard *borrowed from* the [APA]." *Brooks v. United States*, 65 Fed. Cl. 135, 140 (2005) (emphasis added and citation omitted).[20]

The upshot of this history is that our Court resolves military pay claims via cross-motions for judgment on the administrative record, pursuant to RCFC 52.1(c). *See* RCFC Appendix K ("Procedure in Military Pay Cases"). That process "is properly understood as intending to provide for an expedited trial on the record" and requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the

---

correction board proceedings, augmentation of the administrative record is permissible" and that "[t]he APA does not exclude this approach." *Id.* at 1376.

[19] *Walls* relied on two earlier Federal Circuit cases for the proposition that this Court applies the APA in reviewing decisions of military correction boards: *Metz v. United States*, 466 F.3d 991 (Fed. Cir. 2006), and *Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005). *See Walls*, 582 F.3d at 1367 n.11. But neither case mentions the APA even a single time. *Metz*, consistent with precedent, simply noted that "the Court of Federal Claims reviews the Board's action under the same standard as any other agency action," while acknowledging that, fundamentally, military pay claims are money-mandating claims under the Tucker Act. 466 F.3d at 995–98. Similarly, *Fisher* recognized the money-mandating nature of a disability retirement pay claim and explained the standard of review based on "controlling precedents," but did not invoke the APA. *Id.* at 1174, 1180 ("The cases are consistent that this review is conducted under a deferential standard of review, *essentially the standard under which administrative agency decisions are reviewed*" (emphasis added)).

[20] The Federal Circuit's predecessor, the Court of Claims, similarly borrowed "[APA]-type review" for other money-mandating claims. *Foote Mineral Co. v. United States*, 654 F.2d 81, 84–85 (Ct. Cl. 1981) (applying "[APA]-type review" to a refund claim brought pursuant to 43 U.S.C. § 1734(c) (1976), and citing a military pay case, *Sanders v. United States*, 594 F.2d 804 (Ct. Cl. 1979)). As to whether it makes sense to apply APA case law wholesale in such cases, Judge Wolski observed that the more recent "convention of restricting review to the administrative record seems to conflict with the express holding of the Federal Circuit that plaintiffs challenging Correction Board determinations are 'entitled' to supplement this record with additional evidence." *Brooks*, 65 Fed. Cl. at 150 n.22 (quoting *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983)); *see also Joslyn v. United States*, 110 Fed. Cl. 372, 388 (2013) ("Both the record and the de novo evidence are considered to determine whether the decision of the military disability evaluation board was supported by substantial evidence." (citing *Beckham*, 375 F.2d at 785)).

record." *Bannum*, 404 F.3d at 1354, 1356 (applying this standard in a bid protest case); *see Doyon v. United States*, 58 F.4th 1235, 1242 (Fed. Cir. 2023) (explaining, in a case involving the Board for Correction of Naval Records, that the Federal Circuit "review[s] a decision of the Court of Federal Claims granting or denying a motion for judgment on the administrative record without deference" (citations and quotations omitted)).[21]  The Court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof under the applicable standard of review, based on the evidence in the administrative record. *Bannum*, 404 F.3d at 1356–57.

Particularly with respect to the scope of relief, however — just as in a procurement protest action pursuant 28 U.S.C. § 1491(b) — neither Federal Circuit precedent nor this Court's rules preclude the consideration of evidence outside of the agency's record. *See Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 578 n.45 (2021) ("The Court's consideration of such extra-record evidence is appropriate when evaluating prejudice or the propriety of injunctive relief." (citations omitted)); RCFC 52.1, Rules Comm. Notes (2006) ("Cases filed in this court frequently turn only in part on action taken by an administrative agency.  In such cases, the administrative record may provide a factual and procedural predicate for a portion of the court's decision, while other elements might be derived from a trial, an evidentiary hearing, or summary judgment or other judicial proceedings.").

## IV.   DISCUSSION

Before the BCNR, Mr. White succinctly argued his case as follows:

> The United States Navy did not pay me in accordance with 37 U.S. Code 403(a)(1) which requires my BAH be paid according to the "geographic location of the member."  The DoD has subdivided the nation into roughly 350 MHAs and

---

[21] *See also Young v. United States*, 497 F. App'x 53, 58–59 (Fed. Cir. 2012) (explaining that military pay claims and this Court's review of military correction board decisions may be decided via motions for judgment on the administrative record pursuant to RCFC 52.1, which "provides a procedure for parties to seek the equivalent of an expedited trial on a 'paper record, allowing fact-finding by the trial court'" (quoting *Bannum*, 404 F.3d at 1356)); *Acevedo v. United States*, 216 F. App'x 977, 979 (Fed. Cir. 2007) (explaining that this Court, in reviewing decisions of the Army Board for the Correction of Military Records, "is required to make factual findings under [RCFC] 52.1 from the record as if it were conducting a trial on the record" (footnote omitted) (citing *Bannum*, 404 F.3d at 1355–57)).

> it is unquestionable that Seattle and Everett are distinct MHAs. The Navy has violated this law by paying me the Everett MHA rate while forcing me, under military order, to duty within the Seattle MHA. The Navy even admitted to their own mistake. On 29JUL22 the Navy issued a new OCR changing the official homeport for the USS Chosin from Everett to Seattle so that the crew could "receive proper entitlements." I would like to highlight that during this time period, the ship never changed its physical location. Since 30JAN20 this ship has been moored to the pier at Vigor Shipyards in Seattle, Washington. To reject my argument is to agree with the notion that a ship that does not change physical location can somehow legally have 2 different homeports — a ludicrous concept.

AR 007.

The Court agrees with the thrust of Mr. White's argument. There are multiple roads the Court may travel to reach Mr. White's preferred destination, but the simplest route for now is just to observe that the Navy, indeed, "admitted [its] own mistake." AR 007. The Navy essentially ordered a record correction, for the purpose of correcting the crew's "entitlements":

> USS CHOSIN (CG 65) homeport assignment will shift from Everett, WA to Seattle, WA, the actual site of the Depot Modernization period the ship is undergoing. **This homeport change will allow crew to receive proper entitlements**.

AR 076 (emphasis added). The Court reemphasizes that the Navy issued this second homeport order, notwithstanding that the USS *Chosin* had been located in Seattle since January 2020, and remained in Seattle during the entire relevant timeframe. *See* AR 006, 059. The inescapable implication is that the Navy agrees that Mr. White — and presumably other crew members — did ***not*** "receive proper entitlements" (*e.g.*, Seattle BAH pay), prior to the July 29, 2022, homeport change. *Id.*

It makes no difference whether the President, the Secretary of Defense, the Secretary of the Navy, the Chief of Naval Operations ("CNO"), or the BCNR[22] — or anyone else in the chain of command wielding properly delegated authority — makes a record correction for a servicemember "to receive proper entitlements."  AR 007.  That is because, as Judge Nelson of the United States Court of Appeals for the Ninth Circuit correctly explained:

> [T]he "entire 'executive Power' belongs to the President alone." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 213 (2020) (quoting U.S. Const. art. II, § 1).  Yet "it would be 'impossib[le]' for 'one man' to 'perform all the great business of the State,'" thus why the President enlists subordinates to assist him in "faithfully execut[ing]" the laws. *Id.* (quoting 30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939); U.S. Const. art. II, § 3).  But the "buck stops with the President." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 493 (2010).  Article II "makes a single President responsible for the actions of the Executive Branch" — whether they stem from the White House or a federal agency. *Id.* at 496–97 (quotation omitted); *see Louisiana v. Biden*, 55 F.4th 1017, 1031 n.40 (5th Cir. 2022) ("[D]elegations to the President and delegations to an agency should be treated the same under the major questions doctrine.").

> Indeed, a unitary executive is entrenched in our constitutional structure. The Founders envisioned a system in which the executive power is concentrated in a single President who does not make the laws, but executes them.

*State v. Su*, 121 F.4th 1, 18–19 (9th Cir. 2024) (Nelson, J., concurring) (cleaned up).

---

[22] As explained *supra*, military pay cases often begin within the military departments, typically with a record corrections board acting on behalf of the cognizant Secretary.  10 U.S.C. § 1552(a)(1) ("The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice."). In Navy cases, the BCNR acts for the Secretary of the Navy.  *Id.*; *see also* 32 C.F.R. § 723.1 ("This part sets up procedures for correction of naval and marine records by the Secretary of the Navy acting through the [BCNR] to remedy error or injustice."); 32 C.F.R. § 723.7 ("Action by the Secretary").

At a minimum, then, the Navy's decision not to pay Mr. White the BAH he claims is arbitrary and capricious because the CNO's new homeporting decision constitutes the agency's admission of error that it had mistakenly listed the USS *Chosin* as homeported in Everett. The Navy simply failed to address that fact; acting by and through the BCNR, the Navy must explain how the agency may avoid remedying the consequences of its past error. Indeed, the usual rule is that once the agency's error is acknowledged and the record corrected, the concomitant remedy must make the servicemember whole. *Carlisle v. United States*, 66 Fed. Cl. 627, 638 n.11 (2005) (Allegra, J.) (discussing *Sanders*, 594 F.2d 804, and *Denton v. United States*, 204 Ct. Cl. 188, 195 (1974)). In other words, because the revised homeport assignment is tantamount to an admission of error and a record correction, the Court does not understand from the BCNR's decision how the Navy may elect to properly pay Mr. White only prospectively. *Id.* at 638 (explaining that "the nature and scope of the [relief] inquiry here are determined by the Secretary's order that plaintiff be reinstated" and that "mak[ing] the injured service member whole" is "consistent with the basic goal to be achieved in military pay cases" (discussing *Groves v. United States*, 47 F.3d 1140, 1144 (Fed. Cir. 1995)).

To be clear, this Court need not, does not, and will not second guess or otherwise review the Executive Branch's determinations regarding any ship's proper physical location or the relative merits of its assigned homeport for operational purposes. But in this case, the USS *Chosin* was physically located in Seattle from the time Mr. White first reported to the ship for duty, and it was still in Seattle when the CNO's order administratively changed its homeport to Seattle. AR 006, 059.

Moreover, the government never explains how the Navy may disregard the plain language of the BAH statute, which ties such pay to "the geographic location of the member" and not a ship's homeport, which is an administrative assignment. 37 U.S.C. § 403(a)(1). For now, however, the Court reserves the question whether the Navy — in refusing to pay Mr. White the BAH he claims — has violated that provision. Instead, all the Court concludes at this stage is that, at a minimum, the BCNR failed to adequately consider the necessary implication of the CNO's July 29, 2022, order, indicating that "this homeport change will allow crew to receive proper entitlements." AR 076. The BCNR, in denying Mr. White's record correction request, focused myopically on the effective date of that order. According to the BCNR, because the "BAH entitlement changed effective 29 July 2022[,]" Mr. White is "not eligible for BAH . . . retroactive to 22 August 2021, for Seattle, WA[.]" AR 004. But that conclusion merely begs the question why the

effective date of the order is dispositive, as opposed to the express purpose of the new homeport order: to "allow [the] crew to receive proper entitlements."  AR 076.

In sum, no matter how this Court tries to read the new homeport order, this Court is left with the firm conviction that the Navy already admitted that the crew of the USS *Chosin* was *not* "receiv[ing] proper entitlements" prior to the homeport change to Seattle. Again, if the BCNR itself — as opposed to the CNO — had corrected Mr. White's record so that he would "receive proper entitlements," the BCNR could not make that fix prospective only.  Instead, the BCNR would have to remedy the *past* failure to pay Mr. White the "proper [BAH] entitlements."  The fact that the CNO — and not the BCNR — corrected the administrative assignment of the USS *Chosin* should make no difference to the outcome here.  That is because both the CNO and the BCNR act on behalf of the Secretary of the Navy, and they are all Executive Branch actors making decisions ultimately on behalf of the President.  *Cf. Baugh v. Mabus*, 2011 WL 1103851, at *6-7 (E.D. Pa. March 25, 2011) (holding that a Navy Assistant Secretary "was not required to gain approval from the BCNR" prior to adjusting a servicemember's records and, in so doing, did not "infringe[] on the exclusive rights of the [CNO]" because both are "subject to the authority, direction and control of the Secretary of the Navy" and explaining that the CNO also "assist[s] the Secretary of the Navy in carrying out his responsibilities").

Having admitted via the CNO that the prior homeport had to be changed from Everett to Seattle for servicemembers to receive "proper entitlements," the Navy, via the BCNR, must consider the full ramifications of that determination.[23]

Accordingly, this Court exercises its discretion pursuant to RCFC 52.2 to remand this matter back to the Secretary of the Navy — acting by and through the BCNR — to address the agency's failure to provide Mr. White "proper entitlements" from the date he was assigned to the USS *Chosin*, as necessarily implied by the CNO's July 29, 2022, order. If the BCNR decides to correct Mr. White's records and the Navy decides to pay his claim, this case will be over.  If the BCNR reaffirms its prior decision, however, the BCNR shall explain in its new decision on remand how its conclusion is consistent with the CNO's July 29, 2022, order.  This Court will then have to decide whether the Navy's BAH's

---

[23] Even if the government's view of 37 U.S.C. § 403(k)(2) is correct, the CNO's determination is, in effect, on behalf of the Secretary of Navy (and, in turn, the Secretary of Defense).  All this Court holds here is that such a determination has pay consequences pursuant to the relevant money-mandating provision of that statute.

calculation based on the USS *Chosin*'s homeport (*i.e.*, the ship's administrative location)[24] — instead of Mr. White's "geographic location" — was contrary to the statutory command of 37 U.S.C. § 403(a). That question, in turn, may require this Court to consider subsidiary issues such as whether a servicemember's PDS may differ from his or her ship's homeport for BAH purposes, as well as whether the FMR — or yet other internal, subregulatory agency guidance upon which the government relies — is consistent with the plain language of the applicable money-mandating BAH statute.

But at this juncture, this Court sees no reason to grapple with more difficult issues of statutory and regulatory interpretation, delegations, and deference. *See Allen v. United States*, 2024 WL 4002305, at *1 (Fed. Cir. Aug. 30, 2024) ("The Supreme Court has now instructed that courts must 'exercise their independent judgment in deciding whether an agency has acted within its statutory authority' and 'may not defer to an agency interpretation of the law simply because a statute is ambiguous.'" (quoting *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024))); *Shamrock Building Materials, Inc. v. United States*, 119 F.4th 1346, 1355 (Fed. Cir. 2024) (declining to afford agency decisions even *Skidmore* deference where they "do not provide any analysis" of key terms (first citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944); and then *Loper Bright*, 144 S. Ct. at 2259, 2267 (2024))).[25]

## V.    CONCLUSION

Pursuant to RCFC 52.2, this matter is remanded to the United States Department of the Navy, acting by and through the BCNR. On or before May 30, 2025, the BCNR shall render a new decision in light of this opinion and order, specifically addressing the language of the CNO's July 29, 2022, order, in which the Navy admits that Mr. White (and/or the crew of the USS *Chosin*) had not been paid properly prior to that order. If the BCNR declines to correct Mr. White's records and pay, the BCNR shall further explain whether servicemembers must generally live within a specific distance of their PDS and, specifically, whether Mr. White was required to live within a specific distance of the USS

---

[24] *See* OPNAVINST 3111.17C, Enclosure 10 (Definition of Terms), at 2 (May 14, 2024) (defining "Homeport" as "[t]he location a ship is permanently assigned *for administrative purposes* by the CNO and approved by the SECNAV" (emphasis added)).

[25] *Darby Development Co., Inc. v. United States*, 112 F.4th 1017, 1048 n.10 (Fed. Cir. 2024) (concluding that "a federal agency cannot acquire authority by reasonably believing that it has such authority" and that "it is up to the reviewing court to decide 'whether the statute at issue delegates particular discretionary authority to an agency'" (quoting *Loper Bright*, 144 S. Ct. at 2262)).

*Chosin*.   The government should not anticipate any extensions of time absent extraordinary circumstances.

The Clerk is directed to mail a copy of this opinion and order to:

Board for Correction of Naval Records
701 S. Courthouse Road
Building 12, Suite 1001
Arlington, VA 22204-2490

Furthermore, counsel of record for the United States is directed to provide a copy of this order to Navy counsel and the BCNR, in satisfaction of RCFC 52.2(b)(2).

On or before **June 9, 2025**, the parties shall file a copy of the new BCNR decision with this Court along with a joint status report, indicating whether this case has been resolved, whether the Court should review the new BCNR decision in light of the parties' pending MJARs, or whether further briefing is necessary.  Until this Court receives a new BCNR decision, this case shall remain **STAYED**.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge